## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TARON MELVIN,

   Petitioner,

   v.

WARDEN WARNER, and the STATE OF
MARYLAND,

   Respondents.

Civil Action No.: BAH-22-395

## MEMORANDUM OPINION

Self-represented Petitioner, Taron Melvin, filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in which he challenges the validity of his convictions and sentence in the Circuit Court for Baltimore City, Maryland, for second degree murder and related offenses. ECF 1. The Petition is fully briefed. ECFs 1 and 5. Upon review of the submitted materials, the Court finds that no hearing is necessary. Loc. R. 105.6 (D. Md. 2023); Rules 1(b) and 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*. For the reasons set forth below, the Petition will be DENIED.

## I.    BACKGROUND

### A. Convictions and Sentence

On January 12, 2011, a jury in the Circuit Court for Baltimore City found Melvin guilty of second degree murder, use of handgun in the commission of a felony, and possession of a handgun after having been convicted of a disqualifying offense. ECF 5-9, at 28–29. The following relevant

facts, as described by the Appellate Court of Maryland (the "Appellate Court"),[1] were adduced during pretrial and trial proceedings:

> Shaun Williams died of gunshot wounds in the early afternoon of August 26, 2009 in an alley behind Lyndale Avenue in Baltimore. Immediately after gunshots were heard, Melvin and Antonio Patterson were seen running from the alley. A witness who arrived after the shooting saw Melvin "limping" and "holding his pants up" as he fled the alley. Baltimore City Police Officer Rafael McLeod ("McLeod") and Detectives Tavon McCoy ("McCoy") and Shawn Reichenberg ("Reichenberg") found two nine-millimeter shell casings on the ground along with a blood trail leading to 3233 Elmley, the residence of Melvin's former girlfriend, Shameka Waddy ("Waddy"), and their two children. Two additional nine-millimeter casings were found at the rear of the residence.
>
> After observing and following the blood trail to the back door of 3233 Elmley, McCoy and his colleagues made a warrantless entry to search for another victim or potential victim. Following police commands, Melvin and Patterson came down the stairs from the second floor. McCoy noticed Melvin was bleeding from his left foot and the officers called for an ambulance to take him to Good Samaritan Hospital. Melvin was later transferred to the University of Maryland Hospital Shock Trauma Unit, where he was treated by Dr. Christopher Thomas Lebrun ("Lebrun") for a "self-inflicted" gunshot wound to his left big toe.
>
> Meanwhile, Reichenberg obtained a search and seizure warrant for 3233 Elmley, and, upon search of the second floor of the residence, recovered a left tennis shoe with a small hole, a white sock and sweat pants with blood on them, and paperwork for a nine-millimeter handgun licensed to Waddy.
>
>    A. The Suppression Hearing
>
> Prior to trial, defense counsel moved unsuccessfully to suppress McCoy's warrantless entry into the first floor of the residence and the items later recovered pursuant to the search and seizure warrant. The State asserted lack of standing to challenge the search. Defense counsel then asked Melvin a series of questions concerning his relation [to] the residence. Melvin testified that Waddy and their children lived at 3233 Elmley Avenue, that he visited and slept over "sometimes," but "[n]ot on a regular basis," and that he kept clothing there. He admitted further

---

[1] At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland and the Court of Special Appeals was renamed the Appellate Court of Maryland. The name change took effect on December 14, 2022. This was a change in name only and does not affect the precedential value of the opinions of the two courts issued before the effective date of the name change.

2

that on the date of his arrest, he told police that his address was "4028 Fallstaff Road," and that his hospital records from that day reflected the same address.

After hearing this testimony, the court denied Melvin's motion. The court emphasized that, by Melvin's own admission, he only slept over at the residence "sometimes" but "[n]ot on a regular basis." Thus, the court concluded, Melvin lacked standing to challenge the warrantless entry and subsequent search.

B. The Trial

\*\*\*

Thereafter, the State presented its case-in-chief, putting forth evidence that on the date in question, the victim was struck by two bullets, that two additional bullets were fired, that all four bullets were consistent with the shell casings recovered from the alley, and that all shell casings were consistent with the gun and ammunition purchased by Waddy and kept in her house.

The State also presented testimony from Kimberly Morrow, a DNA Analyst for the Baltimore City Police Department, who compared four different blood samples from the blood trail in the alley with DNA swabs taken from Melvin. She concluded that each test "yielded a DNA profile consistent with. . . [Melvin]." She noted further that the "chances of selecting an unrelated individual from a random population possessing the same profile as the evidence samples. . . are approximately one in 912 trillion individuals in the American Caucasian population, one in 3.17 quadrillion individuals in the African-American population, and one in 1.92 quadrillion individuals in the Southeast Hispanic American population."

In addition to this evidence linking Melvin to the crime, the State also sought to qualify Dr. Lebrun as an expert witness to testify as to Melvin's "wound path and how he fixed it and how he came to [the] conclusion" that Melvin's wound was self-inflicted. During voir dire, Dr. Lebrun described his expertise in orthopedic surgery, indicating that he did a fellowship in orthopedic trauma surgery, that he was stationed in Afghanistan in 2000, where he treated individuals with "penetrating injuries from either gunshot wounds, mines, or [improvised explosive devices or IED]," and that he had taken "specialized classes regarding ballistics," specifically "wound ballistics." While stationed in Afghanistan, Dr. Lebrun said, he was responsible for making a "determination of whether [gunshot] wounds were self-inflicted or done by combat," and was able to do so "based on both history and examination of wounds. . .

Defense counsel objected to Dr. Lebrun's testimony, arguing that Dr. Lebrun "can be qualified as an orthopedic doctor [but] should not be qualified" as an "expert in... ballistics." In the course of cross-examination, counsel elicited testimony from Dr. Lebrun indicating that on the day he treated Melvin, he was "not functioning. .

3

. as an expert in ballistics and self-inflicted wounds or trajectories" but instead was working "as an expert to patch [Melvin] up...."

Nevertheless, the court overruled defense counsel's objections and qualified Dr. Lebrun as an expert in "medicine generally, orthopedic trauma surgery, including but not limited to, identification, diagnosis and treatment of gunshot wounds." Dr. Lebrun then offered his expert opinion, again over objection, and told the jury that he believed Melvin suffered from a self-inflicted gunshot wound. Dr. Lebrun's medical report, which reflected this conclusion, was admitted into evidence without objection.[2]

\*\*\*

[2] According to the medical report, Melvin claimed he was "jogging" when he received a gunshot wound to his left big toe. In a section labeled "INDICATION FOR SURGERY," the report read the patient sustained a self-inflicted gunshot wound to the lateral aspect of the distal phalanx of the left great toe.

ECF 5-1, at 163–73.[2]

On March 28, 2011, the Circuit Court sentenced Melvin to an aggregate thirty years' imprisonment. *Id.* at 78–80.

### B.  Direct Appeal

Melvin filed a direct appeal to the Appellate Court, in which he asserted three errors: (1) the Circuit Court erred in ruling that [Melvin] did not have standing to challenge the search of 3233 Elmley Avenue; (2) the Circuit Court erred in permitting the treating surgeon to offer expert testimony that [Melvin's] gunshot wounds were self-inflicted; and (3) [Melvin] was denied his right to a fair trial when the jury was repeatedly made aware of improper other crimes evidence. ECF 5-1, at 54.  On April 30, 2012, the Appellate Court affirmed the convictions and sentence. *Id.* at 167–88.  The Supreme Court of Maryland subsequently denied Melvin's petition for a writ of certiorari. *Id.* at 189–214.

---

[2] Footnote 2 in the quoted material above appears as Footnote 2 in the Appellate Court's opinion.

## C. State Post-Conviction Proceedings

On December 5, 2012, Melvin filed a self-represented petition for post-conviction relief in the Circuit Court for Baltimore City pursuant to the Maryland Uniform Post-Conviction Procedure Act, Md. Code Ann., Crim. Proc. ("CP") §§ 7-101 to 7-204. *Id.* at 16. He raised twenty-five claims of ineffective assistance of counsel. ECF 5-13, at 53–147. When the hearing on Melvin's petition commenced on December 18, 2013, his appointed counsel requested a continuance for additional time to pursue expert testimony. *Id.* at 1–17. Melvin's counsel alternatively asked the post-conviction court to withdraw the petition without prejudice. *Id.* The post-conviction court denied Melvin's requests and proceeded with the hearing. *Id.* at 18–19. The Circuit Court denied Melvin's petition on August 10, 2016. ECF 5-1, at 20. However, the Appellate Court granted Melvin's appeal and vacated that order, directing the post-conviction court to permit Melvin to withdraw his petition without prejudice. *Id.* at 246.

On remand, Melvin asserted the following ineffective assistance of counsel claims:

(1)   Trial counsel was ineffective for failing to conduct an adequate pretrial investigation, including obtaining medical records and investigating Dr. LeBrun, failing to suppress the identification by Charles Welsh, and failing to investigate the expertise of Detective Shawn Reichenberg, ECF 5-14, at 66–68;

(2)   Trial counsel was ineffective for failing to cross-examine Dr. LeBrun with a treatise, *id.* at 68;

(3)   Trial counsel was ineffective for failing to introduce evidence of his dominant hand, *id.* at 68–72;

(4)   Trial counsel was ineffective for failing to adequately prosecute the motion to suppress the warrantless entry of 3233 Elmley Avenue, *id.* at 73–75;

(5)   Trial counsel was ineffective for failing to retain a forensic expert to examine his bullet wounds, *id.* at 75–76;

(6)   Trial counsel was ineffective for failing to object to the state's discovery violation when it failed to disclose Charles Welsh's identification of Melvin, *id.* at 76;

(7)   Trial counsel was ineffective for failing to procure and/or call Detective Borris to
      introduce evidence of his pre-interview notes with Charles Welch, *id.* at 77–79;

(8)   Trial counsel was ineffective for not retaining a forensic pathologist to dispute Dr.
      LeBrun's testimony that his gunshot wound was self-inflicted, *id.* at 79;

(9)   Trial counsel was ineffective for failing to file a motion to suppress the warrantless
      entry of 3233 Elmley Avenue on grounds that it violated his 14th Amendment liberty
      right to refusal of medical care, *id.* at 79–82;

(10)  Trial counsel was ineffective for failing to use forensic crime scene evidence to refute
      the state's theory that his gunshot wounds were self-inflicted. *id.* at 82–84; and

(11)  Cumulative error, *id.* at 84.

The post-conviction court held a hearing on November 18, 2019. ECF 5-14. Forensic

pathologist, Dr. Amy Hawes testified that Dr. LeBrun was unqualified to testify that Melvin's

gunshot wound was self-inflicted, and his testimony was not supported by the evidence. *Id.* at 13–

62. Dr. Hawes also testified that she could not offer an opinion, based on the available evidence,

that Melvin's wounds were not self-inflicted. *Id.* at 54–55. Ultimately, the Circuit Court denied

all of Melvin's post-conviction claims. ECF 5-1, at 255–81.

On March 22, 2021, Melvin filed an application for leave to appeal the denial of his

petition. *Id.* at 282–94. The Appellate Court summarily denied Melvin's application. *Id.* at 311–

12. When the Appellate Court summarily denies a post-conviction petitioner's application for

leave to appeal, no further appeal may be pursued in the Supreme Court of Maryland. *See Mahai*

*v. State*, 255 A.3d 1050, 1053 (Md. 2021) (holding Supreme Court of Maryland does not have

jurisdiction to review Appellate Court's discretionary denial of post-conviction application for

leave to appeal post-conviction proceeding pursuant to Cts. & Jud. Proc. § 12-202).

On February 16, 2022, Melvin filed the present petition for habeas relief, in which he

asserts eight claims for relief:

6

(1)   Trial counsel was ineffective for failing to retain a medical expert to refute the state's theory that his gunshot wounds were self-inflicted, ECF 1, at 7–9;

(2)   Trial counsel was ineffective for failing to investigate the forensics of his gunshot wounds, *id.* at 9–12;

(3)   Trial counsel was ineffective for failing to adequately cross-examine Dr. LeBrun, *id.* at 12–13;

(4)   Trial counsel was ineffective for failing to introduce evidence of his dominant hand, *id.* at 13–14;

(5)   Trial counsel was ineffective for failing to cross-examine Dr. LeBrun using a learned treatise, *id.* at 14;

(6)   Trial counsel was ineffective for failing to conduct an effective pretrial investigation, *id.* at 14–17;

(7)   Trial counsel was ineffective for failing to adequately argue the motion to suppress the warrantless entry of 3233 Elmley Avenue, *id.* at 17–18; and

(8)   Cumulative error, *id.* at 18–19.

Respondents filed an answer, arguing that Grounds One through Seven should be denied on the merits because the state court's denial of his post-conviction petition was neither contrary to nor an unreasonable application of federal law. ECF 5, at 32–90. Respondents argue that Ground Eight should be denied because it is non-cognizable on federal habeas review. *Id.* at 90–92.

## II.   LEGAL STANDARDS

### A. Petitions for a Writ of Habeas Corpus

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see also Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits (1) resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). Furthermore, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.*

**B. Ineffective Assistance of Counsel**

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his

8

defense." U.S. Const. amend. VI. In *Strickland v. Washington*, the Supreme Court held that to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two elements: deficient performance and prejudice. 466 U.S. 668, 692 (1984). First, a petitioner must show that counsel's performance was deficient in that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Deficiency exists when "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Judicial scrutiny of counsel's performance must be highly deferential" and apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Second, the petitioner must show prejudice in that the deficient performance by counsel consisted of errors that "were so serious as to deprive the defendant of a fair trial" with a reliable result. *Id.* at 687. To establish such prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## III.   DISCUSSION

### A.  Grounds One, Two, and Three

Grounds One, Two, and Three relate to trial counsel's strategy with respect to prosecution witness, Dr. Christopher Lebrun. Melvin alleges that trial counsel was ineffective for failing to call a defense expert to rebut the state's theory that his gunshot wounds were self-inflicted, failing to investigate the forensics of his gunshot wounds, and failing to properly cross-examine Dr. LeBrun on the methodology explained by Dr. Hawes during her post-conviction testimony.

Dr. Lebrun testified at Melvin's trial that he is an orthopedic surgeon at the University of Maryland Shock Trauma Center. ECF 5-6, at 19–20. At the time of Melvin's trial, Dr. LeBrun was on active duty status with the Air Force. *Id.* at 22. He was stationed in Afghanistan in 2007 as an orthopedic surgeon where he took care of traumatic injuries from gunshots, improvised explosive devices, and mines. *Id.* at 24–25. Dr. Lebrun testified that he had training in wound ballistics, which is the effect of a projectile on a human or an animal. *Id.* at 28. Dr. Lebrun also testified that he was trained on the difference between high and low velocity wounds and could tell the difference. *Id.* at 26–27. Dr. Lebrun testified that he made determinations in the military about whether gunshot wounds were self-inflicted because it was a "chargeable offense" to negligently discharge a weapon. *Id.* at 30.

The trial court accepted Dr. LeBrun as an expert in orthopedic trauma surgery and the identification, diagnosis, and treatment of gunshot wounds. *Id.* at 59. Dr. LeBrun proceeded to testify that he treated Melvin on August 27, 2009, for gunshot wounds "that skied or barely hit the outside of his leg right below his knee and a through and through wound of his great toe on the outside of his leg below the knee and through the great toe." *Id.* at 62. Based on a combination of history and examination, Dr. Lebrun concluded that the gunshot wounds were self-inflicted at

10

low velocity from a small caliber weapon. *Id.* at 77–78. Melvin's counsel objected to this testimony, but the objection was overruled. *Id.* at 72–73. On cross-examination Dr. LeBrun acknowledged that distance is an important factor in determining whether a wound is self-inflicted, and he is not qualified to determine the distance of a firearm to the wound it causes. *Id.* at 49. Dr. LeBrun also testified that he was unable to determine whether Melvin's two wounds were from the same gun, *id.* at 80–81, could not say how far away the weapon was fired, *id.* at 81–82, and agreed that "it was basically conjecture if [the wound] is self-inflicted or not," *id.* at 93.

Melvin asserted Grounds One, Two, and Three in his post-conviction petition. ECF 5-13, at 127–36, 86–88, 56–63. At the post-conviction hearing on February 12, 2014, Melvin's trial counsel, Stephen Sacks, testified about his approach to Dr. Lebrun's testimony. ECF 5-13, at 22–49. Sacks testified that his strategy was to impeach Dr. Lebrun's credentials. *Id.* at 42. Sacks explained that he was facing the challenges of his client's DNA being at the scene, the ballistics match to a gun associated with his client, and his client's gunshot wounds. *Id.* at 42–43. He also testified that the fact that his client self-treated his gunshot wounds without calling the police posed a challenge. *Id.* at 44–45. Sacks testified that his strategy was to rely on cross-examination, explaining:

> I think if a person sits there and admits they really didn't take cognizance of distances or angles or anything, and the bullet comes through the top of the foot, the question becomes real simple. It comes through the top of the shoe. It doesn't come through the bottom of the shoe, it doesn't come from the front or the back of the shoe. So where is someone going to be standing with that gun to make that bullet hole come into the shoe? I belabor that, I make my client look worse in front of a jury. Okay?

*Id.* at 46–47.

In furtherance of his claim that his trial counsel should have called a defense expert to rebut Dr. Lebrun's testimony, Melvin called forensic pathologist, Dr. Amy Hawes, to testify at his post-

11

conviction hearing on November 18, 2019. ECF 5-14, at 13–62. Dr. Hawes testified that more than the appearance of the wound is needed to determine whether a gunshot wound is self-inflicted. *Id.* at 23. Dr. Hawes cited a study that concluded trauma specialists do not adequately document and often misinterpret gunshot wounds. *Id.* at 28. In her opinion, trauma specialists often make errors in identifying exit and entry wounds and the range of fire. *Id.* Dr. Hawes testified that Melvin's medical records were insufficient to determine entry or exit wounds or the distance from which the bullets were fired. *Id.* at 31. Dr. Hawes testified that range of fire is one of the most important factors in determining whether a wound was self-inflicted, and Dr. Lebrun acknowledged that he was not qualified to make that determination. *Id.* at 36. In Dr. Hawes's opinion, Dr. Lebrun's conclusion was erroneous because the velocity and caliber of the weapon cannot be determined by looking at the wound. *Id.* at 38–41. Dr. Hawes testified that she was not giving an opinion that Melvin's gunshot wounds were not self-inflicted; she could not say how they were inflicted. *Id.* at 54–55.

The post-conviction court denied Grounds One, Two, and Three, concluding that trial counsel made sound strategic decisions:

> Trial counsel's experience in criminal trials of this nature and his awareness of the surrounding circumstances of Petitioner's gunshot wound illustrate that failure to further investigate the forensic evidence was sound tactical decision made with reasonable professional judgement.
>
> \*\*\*
>
> It is apparent from [Sacks's] testimony that trial counsel reasonably believed that cross examination was an appropriate method with which to question the conclusions of the State's expert witness. Ultimately, trial counsel made the sound strategic decision to rely on cross examination of the State's expert witness instead of calling his own expert. Trial counsel recognized that focusing on the location of the Petitioner's bullet wound would "make my client look worse in front of the jury."
>
> \*\*\*

While Dr. Hawes was an impressive witness, this court does not find that trial counsel was ineffective for failing to call forensic pathologist at trial. This court declines to find that the failure to call forensic pathologist fell below an objective standard of reasonableness.

***

Furthermore, as impressive as the court found Dr. Hawes's testimony, her testimony didn't prove that Petitioner's wound wasn't self-inflicted. On the contrary, she stated clearly, "I'm saying that I can't say exactly how the wound was inflicted."

***

In this case, this allegation of ineffective assistance is based on suggestion that counsel should have pursued different strategy for attacking the credibility of the State's witness. Strickland and its progeny dictate that the selection of the best strategy for trying case should not be subject to post-trial attack unless it falls below an objective standard of reasonableness.

***

Assuming arguendo that failure to call forensic pathologist did constitute error, Petitioner's claim would fail as to the second prong that but for the alleged error, the result of the proceeding would have been different. The evidence in this case was strong for the State. DNA proved that Petitioner was at the scene. Petitioner acknowledged his presence at the scene. The trail of Petitioner's blood led directly to the Elmley Avenue address Petitioner shared with Ms. Waddy. The ballistic evidence demonstrated that gun registered to Ms. Waddy fired several shots at the scene. Given all of these facts, trial counsel was not deficient; the evidence against Petitioner was simply too damning to be overcome.

ECF 5-1, at 271, 275–81.

Considering the deference owed to counsel's sound strategic decisions, the Court cannot say that the post-conviction court's conclusions on Grounds One, Two, and Three were contrary to or an unreasonable application of *Strickland*. In trial counsel's judgment, it would have been an error to "belabor" the issue of whether the gunshot wound was self-inflicted. Trial counsel explained that he believed he would lose credibility with the jury because it would have been difficult for Melvin to receive the shot in his foot from any other direction than straight down. Calling a defense witness or additional investigation of the forensics of Melvin's wounds would have highlighted a bad fact that defense counsel desired to avoid. Indeed, as pointed out by the

post-conviction court, Melvin's post-conviction expert was unable to offer testimony that his gunshot wounds were not self-inflicted. Melvin has failed to demonstrate that it was deficient performance for his trial counsel to rely on cross-examination to discredit Dr. Lebrun's testimony.

Melvin also argues that additional research by his attorney or use of a defense expert would have disqualified Dr. Lebrun from testifying. ECF 1, at 12–13. However, counsel's legal arguments about why Dr. Lebrun should not be permitted to testify, made both before trial and during Dr. Lebrun's testimony were overruled by the trial court. ECF 5-2, at 17–31; ECF 5-3, at 12–14; ECF 5-6, at 72–73. The Appellate Court concluded that the trial court did not err, as a matter of law, in concluding that Dr. Lebrun was qualified to identify self-inflicted gunshot wounds. ECF 5-1, at 182. Melvin cannot demonstrate that Dr. Lebrun would have been disqualified based on the use of a defense expert. As explained by the Appellate Court, the standard for qualifying an expert in Maryland is not the opinion of another expert, but rather, "the *trial court* must examine whether the witness has sufficient knowledge, skill, experience, training, or education pertinent to the subject of the testimony." ECF 5-1, at 181 (quoting *Deese v. State*, 786 A.2d 751, 302–03 (Md. 2001)).

Melvin also cannot demonstrate that he was prejudiced by any alleged omission by his counsel with respect to the strategy employed with Dr. Lebrun. As pointed out by the post-conviction court, the inculpatory evidence against Melvin was substantial. A blood trail was located at the crime scene that led directly to 3233 Elmley Avenue. ECF 5-4, at 210–11. Melvin was found inside the residence bleeding from a gunshot wound to his foot. *Id.* at 224. A crime scene technician swabbed the blood drops that were located at the crime scene, *id.* at 301–04, and they were matched to Melvin, ECF 5-6, at 261. An eyewitness, Charles Welch, identified Melvin as the man he saw limping away from the alley where he heard the gunshots. ECF 5-5, at 46.

14

Ballistics matched the bullets from the victim to the gun owned by Shameka Waddy. ECF 5-5, at 244–45; ECF 5-6, at 136, 162–66, 208–09. Waddy is the mother of Melvin's children, and he had access to her home where the gun was stored. ECF 5-5, at 215, 232. Waddy's home is the residence where Melvin was located by the police after the shooting. *Id.* at 216.

Considering this evidence, particularly the ballistics tying Shameka Waddy's gun to the bullets that killed Shaun Williams, Melvin cannot demonstrate that he was prejudiced by his counsel's strategy regarding the testimony of Dr. Lebrun. Dr. Lebrun's testimony that Melvin's gunshot wound was self-inflicted was not outcome determinative. Reasonable jurors would reject a defense theory that Melvin was an innocent bystander based on his connection to the murder weapon combined with the other forensic and eyewitness evidence that placed him at the scene.

For these reasons, the post-conviction court's denial of Grounds One, Two, and Three was neither contrary to nor an unreasonable application of *Strickland*. These claims are without merit and are denied.

### B.  Ground Four

In Ground Four, Melvin contends that his counsel was ineffective for failing to introduce evidence of his dominant hand. Melvin argues that this evidence was crucial to the jury's assessment of Dr. Lebrun's testimony because he is right-handed, and it would have been "impossible" for him to receive a left sided injury based on the state's theory that the gunshot wound was self-inflicted. ECF 1, at 13. Melvin also bases Ground Four on a jury note that was sent during deliberations that read, "Was Melvin right-handed or left-handed?" ECF 5-9, at 23. The jury was instructed to rely on the evidence presented. *Id.*

Melvin asserted Ground Four in his post-conviction petition. ECF 5-14, at 68–72. The post-conviction court rejected the claim, finding that the record does not establish that the evidence

15

was "crucial" and "it would be impossible for any attorney, regardless of skill or experience, to predict all possible questions of jury." ECF 5-1, at 267.

The post-conviction court's conclusion is not an unreasonable application of *Strickland*. As discussed in connection with Grounds One, Two, and Three, *supra*, the issue of whether Melvin's wounds were self-inflicted was not outcome determinative and he cannot demonstrate prejudice. Moreover, Ground Four is speculative in that it necessarily relies on expert testimony and Melvin has failed to name an expert that would have been willing and able to testify that evidence of his dominant hand would have rendered the state's theory impossible. *See Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021) (holding that a petitioner's failure to present a "a specific proffer . . . as to what an expert witness would have testified . . . reduces any claim of prejudice *to mere speculation* and is fatal to his claim").

Ground Four is without merit and is denied.

### C. Ground Five

In Ground Five, Melvin contends that his trial counsel was ineffective for failing to use a learned treatise to cross-examine Dr. Lebrun. Prior to Dr. Lebrun's testimony, Melvin's counsel sought leave from the trial court to cross-examine him with *Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation* (Werner U. Spitz et al. eds., 4th ed. 2006). ECF 5-6, at 6–18. Trial counsel explained to the trial court how he intended to use the treatise during Dr. Lebrun's testimony:

> I'm using this book because there [are] extensive chapters about gunfire and ranges and determining distances and it comes up through the forensic pathology book because that's what a forensic pathologist does or at least part of the (inaudible) along with some ballistics person. I'm--the only thing I'm introducing this for or cross-examining for is the process that is necessary to determine how far away a gunshot was imposed. And that's because there's an allegation here this is a self - inflicted wound. If he cannot testify as to the distance of the wound, that impeaches his testimony. The wound came from, from anything longer than his reach, it would

> be impossible, unless he set up some kind of contraption, to be self-inflicted. That's
> the purpose of the cross.

*Id.* at 15–16. The trial court instructed Melvin's trial counsel, "do the direct, when we get to cross,
let's talk about it." *Id.* at 16.

During his cross-examination of Dr. Lebrun, Melvin's trial counsel did not attempt to use
the treatise. However, Dr. Lebrun testified that he was not qualified to determine distance to the
wound, ECF 5-6, at 49, and he also testified that his opinion on whether the wound was self-
inflicted was "conjecture." *Id.* at 93. During the post-conviction hearing, Melvin's trial counsel
testified that he made the points that he needed to make with Dr. Lebrun during cross-examination.
ECF 5-13, at 33–36.

In his post-conviction petition, Melvin asserted his trial counsel was ineffective because he
failed to use the treatise during Dr. Lebrun's cross-examination. ECF 5-14, at 68–69. The post-
conviction court rejected the claim, concluding that trial counsel's performance was not deficient.
ECF 5-1, at 265–66. Specifically, the trial court found that trial counsel "was able to question the
expert's credibility" and "established that the expert was not pathologist and that the expert was
focusing on treatment of [Melvin's] gunshot wound, not preparation of criminal trial." *Id.* at 266.

The Court cannot conclude that the post-conviction court unreasonably applied *Strickland.*
As mentioned above, trial counsel indicated that his strategy in using the treatise on cross-
examination was to persuade Dr. Lebrun to concede points that Dr. Lebrun voluntarily conceded,
i.e., that distance is needed to determine whether a gunshot wound is self-inflicted. Moreover, for
the reasons explained in connection with Grounds One, Two, and Three, *supra*, Melvin cannot
demonstrate that the outcome of his trial would have changed if his counsel would have used the
treatise to cross-examine Dr. Lebrun. Ground Five is denied for lack of merit.

**D. Ground Six**

17

In Ground Six, Melvin claims his counsel was ineffective for failing to conduct pretrial investigation, which he separates into three parts: (a) failure to retain an expert to rebut Dr. Lebrun's testimony, ECF 1, at 14–16; (b) failure to properly address Charles Welch's identification of Melvin, *id.* at 16; and (c) failure to address the reasons why Melvin's shoes and sweatpants were not tested for gunshot residue, *id.* at 16–17.

### a)    Failure to Retain an Expert

Ground Six, sub-part (a) is denied for the reasons discussed in Ground One, *supra.*

### b)    Failure to Address Identification by Welch

Prior to trial, Melvin's co-defendant, Antonio Patterson, filed a motion to suppress the identification of him made by eyewitness Charles Welch. ECF 5-4, at 33–42. Patterson's counsel called Welch to testify during a hearing to determine whether the identification was impermissibly suggestive. *Id.* Welch testified that he was taken into custody after the shooting and locked in a room at the police station. *Id.* at 36–37. Welch testified that while he was in police custody he saw Patterson walking past the room where he was being held. *Id.* at 40. According to Welch, the police identified Patterson to him as their prime suspect before he gave a taped statement. *Id.* at 44. During Welch's taped statement he said that he saw a male with long dreads and a light-skinned male with a limp running from the alley. *Id.* at 46–49. Welch identified both defendants as the individuals he saw running from the alley. *Id.* at 52.

After Welch testified, Melvin's counsel informed the trial court that he intended to join the co-defendant's motion to suppress because Welch had never identified Melvin before and there was nothing in discovery indicating that Welch had made a previous identification. *Id.* at 54–59. Patterson's counsel argued that Welch's identification was unduly suggestive because Patterson was escorted by the room where Welch was being held before his recorded statement and the police

identified Patterson as the prime suspect. *Id.* at 78, 123–25. The trial court denied the motion as to Melvin, finding there was no suggestiveness. *Id.* at 141. It also denied the motion as to Patterson, finding that the reliability of the identification outweighed any suggestiveness. *Id.* at 141–42.

Melvin contends his counsel's lack of awareness that Welch was going to identify him before the pretrial hearing constituted deficient performance. He also argues that Welch's identification must have been the result of impermissibly suggestive police procedures. ECF 1, at 16. Melvin asserted this part of Ground Six in his post-conviction petition. ECF 5-14, at 76. The post-conviction court denied the claim because Melvin could not demonstrate prejudice.[3] ECF 5-1, at 264.

The record establishes that Melvin was at the hospital when Welch observed and identified his co-defendant, Patterson, at the police station. ECF 5-7, at 76–80. Melvin's counsel indicated at the pretrial hearing that he received no notice in discovery that Welch had made an identification of Melvin. There are no documents or testimony in the record to substantiate Melvin's claim that his counsel should have known that Welch was going to identify him before Welch made the in-court identification during the pretrial hearing.

Melvin also cannot demonstrate that he was prejudiced in any way by his counsel's performance. Patterson advanced an argument that Welch's identification was impermissibly suggestive based on testimony that Welch saw Patterson at the police station before his recorded statement. No such testimony exists with respect to Welch's identification of Melvin, and Melvin

---

[3] The post-conviction court analyzed the claim in a slightly different posture, addressing whether trial counsel was ineffective for joining the co-defendant's motion to suppress in lieu of filing a separate motion. ECF 5-1, at 264. Because the Respondent has not asserted that the claim is procedurally defaulted, the Court has addressed this claim on the merits.

has not produced any testimony that his counsel failed to elicit that would have changed the trial

court's conclusion. This claim is denied.

c)   Failure to Address Gunshot Residue Testing

In sub-part (c), Melvin faults his counsel for failing to conduct sufficient pretrial research

to determine the reasons why his sweatpants and shoes were not tested for gunshot residue. He

also contends that if his counsel had conducted additional pretrial research, he would have learned

Detective Reichenberg's "specialized knowledge in dealing with gunshot wounds." ECF 1, at 16–

17.

In response to his post-conviction claims of the same nature, the post-conviction court

concluded:

> Petitioner next claims that "[i]f defense counsel had conducted effective pre-trial
> investigation, he would have been able to ascertain the reason why the shoes and
> sweatpants were not tested." First, nowhere in the rules governing discovery is there
> a requirement that the State provide its reasons for testing or declining to test
> evidentiary items. There is no likelihood that pre-trial investigation would have led
> to trial counsel discovering the detective's motives for testing or failing to test any
> items. There is no support for the theory that counsel committed error in failing to
> conduct pre-trial investigation in this regard. Petitioner argues that pretrial
> investigation would have "made counsel aware of [Detective Reichenberg's]
> specialized knowledge in dealing with self-inflicted gunshot wounds." . . . The
> record is devoid of any evidence either that trial counsel was unaware of Detective
> Reichenberg's training or expertise or that additional pretrial investigation would
> have resulted in different outcome for Petitioner. Therefore, this court finds that
> Petitioner is not entitled to relief based on this claim.

ECF 5-1, at 265.

Melvin has failed to meet the standard that the post-conviction court's conclusion was an

unreasonable application of *Strickland*. As explained, *supra*, trial counsel's strategy for managing

the issue of the self-inflicted wounds was to impeach the credentials of the state's expert and

minimize any potential negative impacts on the jury. The post-conviction court's conclusion that

this was a sound strategy was not unreasonable. Also, as observed by the post-conviction court,

Melvin cannot establish that additional knowledge about the gunshot residue testing or the background of Detective Reichenberg would have changed the outcome of his trial. Thus, this claim is denied, and Ground Six is denied in its entirety.

### E. Ground Seven

In Ground Seven, Melvin contends that his counsel failed to adequately argue the motion to suppress the warrantless entry and subsequent search of 3233 Elmley Avenue. Particularly, Melvin contends that his counsel should have argued that the "community caretaking" exception was pretext for the warrantless entry because he was immediately handcuffed and arrested after the police entered the residence. ECF 5-14, at 73–75; ECF 1, at 17–18.

The trial court heard Melvin's motion to suppress on January 3, 2011. ECF 5-2. Detective Tavon McCoy testified that when he responded to the crime scene on August 26, 2009, he saw a blood trail and followed it down the alley to a residence on Elmley Avenue. *Id.* at 33–35. Detective McCoy testified that the officers received no response after knocking on the door and a decision was made to force entry into the residence because there was concern that another victim could be located inside. *Id.* at 35–36. Once law enforcement entered the residence, they relayed verbal commands and the two defendants, Melvin and Patterson, came down the stairs. *Id.* at 37. An ambulance then transported Melvin to the hospital. *Id.* at 54–55. After Melvin and Patterson had left the premises, police "obtained a search and seizure warrant for 3233 Elmley, and, upon search of the second floor of the residence, recovered a left tennis shoe with a small hole, a white sock and sweat pants with blood on them, and paperwork for a nine millimeter handgun licensed to Waddy." ECF 5-1, at 169.

Melvin's counsel argued that the "community caretaking function" ceased once Melvin was taken into custody and the subsequent search warrant was based on observations by law

enforcement that went beyond the scope of the "community caretaking function." ECF 5-2, at 71–
74. The trial court ruled that Melvin was required to show standing to challenge the warrant. *Id.*
at 82.

Melvin testified that the resident of the home on Elmley, Shameka Waddy, is the mother
of his children. *Id.* at 83–84. Melvin did not stay at the home on a regular basis, only sometimes,
and kept some of his belongings there. *Id.* at 84. On cross-examination, Melvin testified that he
gave his address as 4028 Fallstaff Road when he was arrested and gave that same address to the
hospital. *Id.* at 86–87. After hearing the testimony, the trial court ruled that Melvin did not have
sufficient ties to the premises to establish standing to challenge the items seized by the warrant
because he only stayed at the Elmley Street address "sometimes" and gave a different home
address to the police. *Id.* at 90.

On direct appeal, the Appellate Court found that the trial court did not err in concluding
that Melvin lacked standing to challenge the warrantless entry and the search warrant because he
did not have a relationship to the residence that established a reasonable expectation of privacy.
ECF 5-1, at 174–77. Melvin argued that he had a reasonable expectation of privacy as a
"welcomed guest," pursuant to *Minnesota v. Olson*, 495 U.S. 91 (1990). *Id.* at 175. Though
Melvin testified that he "sometimes" stayed at the residence, the Appellate Court found that he
"failed to present any evidence tending to show that Waddy knew he was at the residence on the
date of arrest, let alone any facts establishing that she gave him permission to enter the premises
and stay as a houseguest." *Id.* at 176. The Appellate Court alternatively held that the motion to
suppress was properly denied because the entry was "justified under Maryland's analogy to the
community caretaker exception to the warrant requirement . . . 'based upon the premise that law
enforcement officers should be able to act without a warrant when they reasonably believe a person

needs immediate attention.'" *Id.* at 177 (quoting *Wilson v. State*, 975 A.2d 877, 887 (Md. 2009) and citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

Melvin argued in his post-conviction petition, as he does in Ground Seven, that his counsel was ineffective because counsel should have argued that the "community caretaking function" was merely pretext for the warrantless entry since he was immediately arrested when the police entered the residence. ECF 5-13, at 68–75; 5-14, at 73–75. The post-conviction court rejected the claim, finding that the trial court denied his motion to suppress because he lacked standing to challenge the warrantless entry and the subsequent warrant. ECF 5-1, at 267–78. The post-conviction court also found that Melvin's argument regarding the "community caretaking function" lacked merit because "the police officers made the appropriate choice to ensure that no one was dying behind a door with a blood trail leading up to it." *Id.* at 269. The post-conviction court rejected Melvin's argument that the "community caretaking function" was pretext, finding:

> The police entered the home pursuant to their duty to care for members of the community who might be in peril. Once they entered, it became obvious that Petitioner needed medical assistance. It was also obvious that it was necessary to preserve possible evidence while they obtained a warrant, and they applied for a warrant without delay. Therefore, while Petitioner complains that his hands were bagged and that he was handcuffed while at the hospital, none of these facts suggest that the officers used their community caretaking function as pretext to enter the Elmley Avenue address.

*Id.* at 269–70.

The record reflects that the trial court properly denied Melvin's motion to suppress because he did not have a legitimate expectation of privacy in the residence on Elmley Avenue and could not establish standing to challenge the warrant. *See Rakas v. Illinois,* 439 U.S. 128, 143–44 (1978) ("Capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *see also United States v. McLennon*, 62 F. App'x 447, 448 (4th Cir. 2003) (holding that

23

one "merely present with the consent of the householder" lacks a legitimate expectation of privacy (quoting *Minnesota v. Carter,* 525 U.S. 83, 90 (1998))). Because the trial court ruled Melvin had no standing to challenge the warrant, he cannot demonstrate that he was prejudiced by his counsel's approach to the "community caretaking function" argument.

In any event, Melvin cannot demonstrate that his counsel was ineffective because, even if he had standing to challenge the entry and subsequent search warrant, and even if the community caretaking exception was inapplicable, exigent circumstances justified the officers' entry into the Elmley Avenue address. *See Hunsberger v. Wood,* 570 F.3d 546, 554 (4th Cir. 2009) (holding the community caretaking exception is not appropriate "when the search in question was performed by a law enforcement officer responding to an emergency, and not as part of a standardized procedure, [and] the exigent circumstances analysis and its accompanying objective standard should apply"). In an exigent circumstances inquiry, the question is whether an "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* (quoting *United States v. Moss,* 963 F.2d 673, 678 (4th Cir. 1992)).

Here, the record establishes that law enforcement officers observed a blood trail leading from a crime scene where a victim had received a fatal gunshot wound. That blood trail led to the door of the residence located at 3233 Elmley Avenue. Because it was objectively reasonable for the officers to believe that another victim in need of medical assistance may have been in the Elmley Avenue residence, the exigent circumstances exception to the warrant requirement applies, and Melvin cannot establish that he was prejudiced because his counsel failed to argue that the officers used pretext to enter the residence unlawfully.

24

For these reasons, the state court's denial of Ground Seven was neither contrary to nor an unreasonable application of *Strickland* and it is denied for lack of merit.

### F. Ground Eight

In Ground Eight, Melvin contends that his counsel was ineffective due to "cumulative error." ECF 1, at 18. "[I]neffective assistance of counsel claims ... must be reviewed individually, rather than collectively . . . ." *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998). Moreover, "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be *constitutional error*, not the cumulative effect of all of counsel's actions deemed deficient." *Id.* at 852 n.9 (emphasis added). Because the Court has concluded that trial counsel did not provide ineffective assistance of counsel, a cumulative error analysis is inappropriate, and the post-conviction court's rejection of this claim for the same reasons is neither contrary to nor an unreasonable application of federal law. *See* ECF 5-1, at 275.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner may not appeal the denial of a federal habeas petition without first receiving a certificate of appealability. 28 U.S.C. § 2253(c)(1). The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, the Court has denied the petition on the merits, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Upon a review of the record, this Court finds that Petitioner has not made the requisite showing. The Court therefore declines to issue a certificate of appealability. Melvin may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. Fed. R. App. P. 22.

## V.    CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus will be **DENIED**.  The Court will decline to issue a certificate of appealability.  A separate Order shall issue.


October 3, 2024                                                    /s/
Date                                              Brendan A. Hurson
                                                  United States District Judge